UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRYLE POLLARD,

    Plaintiff,                                                           Case No.  1:18-cv-00404-GJQ-PJG

v.                                                                                     HON.  GORDON J. QUIST

CITY OF MUSKEGON HEIGHTS,
BRANDON M. DEKUIPER,
MICHAEL T. EDENS, and
MICHAEL M. RATLIFF,
In their individual and official capacities,

    Defendants.
_____

| Christopher J. Trainor (P42449) | Michael S. Bogren (P34835) |
| Shawn C. Cabot (P64021) | Robert A. Callahan  (P47600) |
| Attorneys for Plaintiff | Attorneys for Defendants |
| CHRISTOPHER TRAINOR & ASSOCIATES | PLUNKETT COONEY |
| 9750 Highland Road | 950 Trade Centre Way, Suite 310 |
| White Lake, Michigan   48386 | Kalamazoo, Michigan   49002 |
| (248-886-8650) | (269-226-8822) |
| Shawn.cabot@cjtrainor.com | mbogren@plunkettcooney.com |
|  | rcallahan@plunkettcooney.com |

**BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION.**

Police, when responding to domestic violence calls, cope with concerns for officer and citizen safety due to the heightened emotional aspects of the situation, as well as the possibility of the presence of weapons. **Exhibit A,** DeKuiper dep. tr., p. 62 line 15 through p. 63 line 23. On April 19, 2016, Muskegon Heights police officers responded to a 911 call of domestic violence in which a knife was reported as being involved. As set forth, *infra*, the officers attempted to defuse the situation. Unfortunately, Plaintiff interjected himself into the dispute, by attempting to fight with the boyfriend of the person who called.. The

difference in the actions of the boyfriend, Demario Collins, and of Plaintiff, could not be more stark. Collins did not resist being handcuffed until such time as the altercation between himself and Plaintiff could be calmed down. Plaintiff, on the other hand, attempted to get at Demario Collins, and resisted law enforcement attempts to remove him from the area and handcuff him until the situation could settle down. Minimum amount of force was used by Defendants to remove Plaintiff from the house and handcuff Plaintiff, in light of Plaintiff's continuing resistance. Plaintiff claims excessive force was used against him and he sustained a back injury as a result.

Plaintiff has brought a two count complaint alleging excessive use of force against the individual police officers, and a claim for municipal liability against the City of Muskegon Heights. For the reasons which follow, Defendants submit this Court must grant their motion for summary judgment.

## II.   FACTUAL BACKGROUND.

Plaintiff's step-daughter is Destiny Kimble. On April 19, 2016, she was living with her boyfriend, Demario Collins, at 504 W. Cleveland St., Muskegon Heights. **Exhibit C,** D. Kimble dep. tr., p. 23 lines 17-25.  Destiny Kimble testified she and Demario Collins had a history of conflict and domestic issues, including that on one occasion she reported he had choked her. **Exhibit C,** p. 15 lines 20-25, p. 17 line 5 through p. 18 line 1. Plaintiff was advised of these problems between Kimble and Collins, and had words with Collins regarding his mistreatment of Kimble. **Exhibit C,** p. 18 lines 2-7.

In the early morning hours of April 19, 2016, another domestic dispute arose between Kimble and Collins. Collins got home at approximately 4:00 am.  Kimble was angry because she believed Collins was cheating on her. She waited until Collins fell asleep, and

then grabbed his phone to check on text messages to prove he was cheating. Collins later woke up and looked for his phone. When Kimble refused to give Collins his phone, Collins grabbed her phone. **Exhibit C,** p. 24 lines 4 through p. 26 line 6. Kimble called her mother, Ramona Pollard. Crying dramatically, Kimble told her mother Collins was "putting his hands on me and he wouldn't give me my phone." **Exhibit C,** p. 27 line 14 through p. 28 line 1. Kimble also called 911 to report the abuse by Collins. 911 was also advised by Kimble a knife was involved. **Exhibit C,** p. 28 line 23 through p. 29 line 14.

Plaintiff testified after Kimble called Ramona Pollard, Kimble called him. Kimble was crying, and told him that Collins had taken her phone. Kimble told Plaintiff she had called the police, and the police were almost at the house. Despite the fact the police had been called and were almost at the house, Plaintiff took it upon himself to go over instead of letting the police handle the issue between Kimble and Collins. **Exhibit B,** p. 52 lines 13-24; p. 53 lines 19-24; p. 54 lines 15-17.

Because of the report of domestic violence with knife involved, five officers from the Muskegon Heights Police Department responded. Officer Kuklewski and Sgt. Scott Sinclair were the first to arrive in separate cars. **Exhibit G,** Kuklewski dep. tr., p. 14 lines 15-22; p. 15 lines 12-14; **Exhibit H**, Sinclair dep. tr., p. 16 line 24 through p. 17 line 3; p. 18 lines 1-7. Both Kuklewski and Sinclair parked their squad cars in the street. Kuklewski and Sinclair separated Collins and Kimble to talk to them. Sinclair took Collins into the kitchen, and Kuklewski stayed in the dining room with Kimble. **Exhibit H,** p. 20 lines 15-20. DeKuiper heard the radio dispatch, including that a weapon was involved, so he responded. **Exhibit A,** p. 17 lines 8-10; p. 19 line 20-24. DeKuiper parked on the street, as well, and entered the side door. When DeKuiper went into the side door, he made contact with Sinclair, who was

3

talking to Collins in the kitchen. **Exhibit A**, p. 25 lines 20-22. Collins and Sinclair were talking, with Collins providing his side of the story to Sinclair. **Exhibit A,** p. 27 lines 6-9.

At the side entranceway there was a mudroom area, with approximately 5 steps leading up to enter into the kitchen. **Exhibit A,** p. 26 lines 1-17. DeKuiper positioned himself on the steps where he could see into the kitchen. **Exhibit A,** p. 26 line 20 through p. 27 line 3.

Officer Michael Ratliff also responded to the dispatch to provide back-up. **Exhibit F,** M. Ratliff dep. tr., p. 10 lines 11-15. Ratliff also parked in the street. **Exhibit F**, p. 12 lines 3-10. Ratliff positioned himself on the top step from the mudroom to the kitchen, with one foot on the kitchen floor. **Exhibit F,** p. 16 lines 1-22. Ratliff was watching to make sure the situation was under control. **Exhibit F,** p. 20 lines 5-6.

Officer Michael Edens was the last to arrive at the house at 504 W. Cleveland. **Exhibit E,** M. Edens dep. tr., p. 20 line 23 through p. 21 line 20. When Edens arrived, Ratliff was at the top of the steps, with DeKuiper below Ratliff. Edens remained on the floor of the mudroom. **Exhibit E**, p. 25 lines 1-7. Sinclair was with Collins, keeping Collins separated from Kimble to maintain calm over the situation, and for the police to figure out what was going on. **Exhibit E,** p. 26 lines 11-18. Accordingly, the situation had been calmed down. And then Plaintiff arrived on the scene.

When Plaintiff arrived at the house, he parked in the driveway at the rear of the house. **Exhibit B,** Plaintiff's dep. tr., p. 55 lines 18-19. Demario Collins' truck was parked right next to the back door of the house. The truck was close to the house, there was an approximately 4-5 foot area between the side of the house and the truck. **Exhibit A**, p. 70 lines 1-8. Plaintiff entered the house and went into the mudroom. When Plaintiff and

4

Collins saw each other, a verbal altercation immediately arose. Plaintiff testified Collins yelled "What your old ass doing here, you ain't going to do shit." **Exhibit B,** p. 62 lines 1-2. Plaintiff testified Collins also referred to him as an "old mother fucker." **Exhibit B,** p. 64 line 21 through p. 65 line 11. Plaintiff further testified he pointed his finger at Collins and said "I'm whooping your ass." **Exhibit B,** p. 62 lines 7-8. Officer Ratliff testified when Plaintiff arrived, he wanted to talk to Kimble, but was directed to wait. **Exhibit F,** p. 22 lines 3-25. Edens and DeKuiper told Plaintiff to stop and to leave the house. **Exhibit E,** p. 33 lines 18-22; **Exhibit A**, p. 34 line 4 through p. 35 line 6. At that point, as Plaintiff and Collins were yelling and threatening each other, Plaintiff attempted to get past DeKuiper on the steps to get at Collins. **Exhibit A**, p. 35 line 17 through p. 36 line 19; **Exhibit E**, p. 34 lines 1-4, p. 35 line 11 through p. 36 line 4; **Exhibit F**, p. 23 line 21 through p. 24 line 3; **Exhibit H**, S. Sinclair dep. tr., p. 24 lines 17-18, p. 27 line 24 through p. 28 line 8.

As a result of this rapidly evolving angry confrontation between Plaintiff and Collins, law enforcement officers took immediate action. Collins testified he "got rushed." Policemen grabbed him and put him in handcuffs. He testified one policeman grabbed each arm. Collins did not resist the officers in their attempts. **Exhibit D,** D. Collins dep. tr., p. 21 line 6 through p. 22 line 24. Plaintiff testified when he pointed at Collins and yelled he was going to whoop Collins' ass, the law enforcement officers rushed him out the back door. **Exhibit B,** p. 62 lines 7-14. They grabbed Plaintiff by the shoulders, and directed him out the door. **Exhibit B**, p. 66 lines 21-23.

The testimony between the law enforcement officers and Plaintiff, regarding how Plaintiff ultimately was handcuffed, differs greatly. Irrespective of whose version of the

5

story one would believe, however, the force used by law enforcement officers relative to the situation presented to them and the resistance by Plaintiff, was reasonable.

Michael Edens testified DeKuiper placed his hands on Plaintiff, and escorted Plaintiff out of the house. Edens attempted to assist but he got out of the way because he felt he would be in the way. **Exhibit E,** p. 37 lines 7-22. Edens testified once outside, DeKuiper and Ratliff were able to place Plaintiff into handcuffs. Edens did not assist in that action. **Exhibit E**, p. 39 lines 18-22.  He testified there was a shuffle between DeKuiper, Ratliff, and Plaintiff, and that it was a very short period of time between the time Plaintiff was taken out of the house and he was cuffed. **Exhibit E,** p. 40 lines 5-22.

Ratliff testified when DeKuiper attempted to grab Plaintiff by the arm, Plaintiff pulled it away from DeKuiper. **Exhibit F,** p. 27 lines 12-14. Ratliff assisted DeKuiper in getting Plaintiff out of the house by grabbing onto the opposite arm DeKuiper had. **Exhibit F,** p. 30 lines 8-21. Ratliff testified once they got Plaintiff outside, they attempted to place Plaintiff in handcuffs but Plaintiff struggled by pulling his arms away from them. **Exhibit F,** p. 31 lines 7-12.  Plaintiff's resistance caused Ratliff to be thrown off balance, and they hit the side of the house at one point in time. During the struggle they hit the truck as well. Ratliff testified it was almost like a "pinball machine" type of interaction between himself, DeKuiper, and Plaintiff. **Exhibit F**, p. 31 line 15 through p. 33 line 20. They finally were able to place Plaintiff against the truck, and Ratliff was able to handcuff Plaintiff.

DeKuiper testified Plaintiff resisted their efforts to take him out of the house, and to be handcuffed. DeKuiper characterized Plaintiff's actions in resisting as pulling away and squirming. **Exhibit A**, p. 37 line 25 through p. 38 line 16. DeKuiper testified it was possible Plaintiff may have made contact with the house. **Exhibit A**, p. 43 lines 5-7. Once outside the

house, DeKuiper held Plaintiff against the parked vehicle so he could get further control over Plaintiff.  Once they had control over Plaintiff's hands, they were able to handcuff him. **Exhibit A**, p. 40 lines 8-15.

Plaintiff testified once they were outside the house, the officers kept trying to get him on the ground, and that he told them on numerous occasions that he couldn't get on the ground. Plaintiff testified during this process, the law enforcement officers "was just slamming me everywhere, trying to get me on the ground." **Exhibit B**, p. 68 lines 8-16. Plaintiff further testified law enforcement officers slammed him into the truck. Plaintiff interpreted that as the officers' attempting to get him to the ground. Plaintiff testified the law enforcement officers were attempting to get his arms behind his back. He believed they were doing so when they were telling him to get to the ground. **Exhibit B**, p. 69 lines 2-20. Plaintiff admitted the law enforcement officers did not strike him as they were trying to handcuff him. They did not spray him with mace or pepper spray. They did not hit him with a stick behind his legs, or hit him at all for that matter. **Exhibit B**, p. 104 lines 13 through p. 105 line 1. Plaintiff testified the law enforcement officers tried to sweep his legs out on one or two occasions, without effect. **Exhibit B**, p. 105 lines 2-13. Plaintiff testified it took the law enforcement officers about three minutes to get him to the ground after they got him out of the house. **Exhibit B,** p. 106 lines 18-20. Plaintiff testified during that approximately 3 minute period of time, he was told to go to the ground on numerous occasions, and he did not obey those orders. He further testified that during that three minute period of time, leg sweeps were attempted to knock him off balance to get him to the ground. Plaintiff testified the officers attempted to get his hands behind his back to cuff him during that period of time as well. **Exhibit B**, p. 106 line 23 through p. 107 line 17. Plaintiff agreed the officers

7

were not able to get his hands behind his back until he was on the ground. **Exhibit B**, p. 107 lines 21-22. There is no question that it wasn't until Plaintiff was on the ground that he finally advised the officers he recently had back surgery. **Exhibit B,** p. 107 line 25 through p. 108 line 5.

There also is no dispute that when Plaintiff advised the law enforcement officers he recently had back surgery Plaintiff's handcuffs were repositioned so he was cuffed in front. **Exhibit A**, p. 45 line 7-11. When Plaintiff advised of his recent back surgery, an ambulance was called to take him to the hospital.

Law enforcement officers did not charge Plaintiff with any offense. As DeKuiper testified, because the situation involving Plaintiff was his attempting to protect his step-daughter, and the lack of severity of Plaintiff's touching of DeKuiper, charges were not warranted. **Exhibit A**, p. 49 lines 10-23.  A day or so after the incident, Plaintiff requested a Citizens Complaint form from the Muskegon Heights Police Department. Plaintiff completed the Complaint. A copy of that Complaint is attached as **Exhibit I.** Plaintiff's Complaint was investigated by the Department, and Chief of Police Thomas determined, based upon his review of all the statements provided, the amount of force used against Plaintiff was appropriate given the situation.

**III.   ANALYSIS AND ARGUMENT**

   **A.   The Amount Of Force Used Against Plaintiff Was Reasonable Given The Circumstances.**

Excessive use of force claims are analyzed under the Fourth Amendment "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 396 (1989).  As set forth by the Supreme Court in *Graham*, whether the use of force is reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. As admonished by the Supreme Court, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly involving, about the amount of force that is necessary in a particular situation." *Id.* at 396-97. This reasonableness inquiry is objective, it is made without regard to the underlying intent or motivation of the officers. *Id.* at 397.

Courts do not use a "de minimis" standard in the analysis. In other words, if Plaintiff argues he was only resisting in a small manner, it is not dispositive. "When a person resists arrest - say, by swinging his arms in officers' direction, balling up, and refusing to comply with verbal commands - the officers can use the amount of force necessary to ensure submission." *Rudlaff v. Gillespie*, 791 F.3d 638, 643 (6th Cir. 2015).

The Sixth Circuit has noted that tasing an arrestee is reasonable where that arrestee was particularly violent, or physically resisting, so as to endanger responders. "Active resistance includes physically struggling, threatening, or disobeying officers. It also includes `refusing to move your hands for the police to handcuff you.'" *Kent v. Oakland County,* 810 F.3d 384, 391 (6th Cir. 2016), (quoting *Rudlaff*, 791 F.3 at 641).

In this case, the Defendants were responding to a domestic violence call. Domestic violence types of incidents can be volatile, and present potential dangers to the participants, the police officers, and neighbors/by-standers. **Ex A**, page 62, line 9-page 63, line 23.  The 911 call reported the presence of a weapon. The Defendants were not aware

9

whether or not Plaintiff was armed. Certainly, the situation at the house escalated very quickly between Plaintiff and Collins upon Plaintiff's arrival. They were hostile and threatening to each other. They had to be separated and the situation stabilized. If Defendants' version is believed, then exceedingly minimal force was used. Plaintiff was escorted out of the building, placed against the car, and his hands cuffed behind his back. There is no question that Plaintiff was not compliant with the officers' orders.

If Plaintiff's version of the events is to believed a different scenario is presented, but the conclusion should not change.. In that scenario, Plaintiff was not compliant with the officers' orders that he get on the ground. He also was not compliant with the orders that he place his hands behind his back to be handcuffed. Plaintiff was resisting, and continued to do so. Under the scenario presented by Plaintiff, the officers used a leg sweep tactic to get Plaintiff off his feet and onto the ground. Plaintiff's version of the event goes farther, however. He testified he was slammed into the house, as well as against a truck. The facts are the incident lasted three minutes at most. It took place in a confined area – four to five feet between the house and a truck. It should be no surprise that the officers and Plaintiff could strike the house and/or truck in light of the struggle made necessary by Plaintiff's resistance in such a confined area.

As further evidence minimal force was used by the officers is the lack of injury to Plaintiff, other than the reinjury to his back alleged in his complaint. As Plaintiff concedes, he experienced no injury, bruises, or abrasions to his face, hands, chest area, or knees. He believes he may have scraped his elbows. **Ex. B**, Page 37, line 2-Page 38, line 20. The officers did not hit, strike, spray, or utilize a taser on Plaintiff. Lower levels of force were utilized to get control of Plaintiff, in either version of the stories as presented by the

10

parties. If the use of a taser is reasonable in the circumstances in which someone is physically resisting the officers, such as in *Kent, supra*, then it necessary follows the lesser amount of force used in this case, under either version of the facts, was reasonable.

### B. Plaintiff's Inaction Claim Must Be Dismissed.

Plaintiff alleges one or all of the Defendant officers violated his constitutional rights because he was "deliberately indifferent to the excessive force" that was being used by fellow officers. That Defendant was Michael Edens. In order to prevail on an inaction theory, Plaintiff must establish Edens had "reason to know that excessive force would be or was being used, and had the opportunity and the means to prevent the harm from occurring." *Goodwin v. City of Painesville,* 781 F.3d 314, 328 (6th Cir. 1997); See also *Alexander v. Carter Forbyrd,* 733 Fed. Appx. 256, 265 (6th Cir. 2018)("an excessive use of force lasting ten seconds or less does not give a defendant enough time to perceive the incident and intervene and stop such force.").

As established through the testimony of the witnesses, the incident between Plaintiff, DeKuiper, and Ratliff was very short in duration. Under Plaintiff's version, they struggled in the confined area, with leg sweeps being attempted to get him to the ground for handcuffing. The struggle did not last very long. No one hit or struck Plaintiff. No one sprayed him, or used a taser on him. Plaintiff did not advise the officers of his recent back surgery until after Plaintiff was on the ground and cuffed. Accordingly, even under Plaintiff's version of events, there is no evidence Edens had the opportunity to know excessive force was being used against Plaintiff, and an adequate amount of time intervene and stop that use of force.

### C. Plaintiff's Municipal Liability Claim Must be Dismissed.

Plaintiff alleges the City of Muskegon Heights is liable because of some policy, custom, or practice of failure to train, supervise, and discipline its officers. In the seminal case of *Monell v. Department of Soc. Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities are persons subject to §1983 liability, but may not be held liable merely on a *respondeat superior* theory for the actions of their employees. *Monell v. Dept. Soc. Servs.,* 436 U.S. 658, 691 (1978). In order to impose liability on the City, Plaintiff must establish that the City, through its own deliberate conduct, was the "moving force behind the injury alleged." *Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Plaintiff must establish the Defendants were acting pursuant to an official policy or custom of the City. *Graham v County of Washtenaw*, 358 F.3d 377 (6th Cir. 2004). Requiring Plaintiff to identify and prove a policy or custom assures that the City will be held liable only for those deprivations which were the result of decisions made by its duly constituted legislative body or officials, whose acts clearly may be identified as those of the municipality. An act which is performed pursuant to a "custom, that has not been formally approved by the decision maker of the municipality may fairly subject a municipality to liability on the theory that the relevant practice is so wide spread as to have the force of law." *Brown, supra* at 403-404.

Plaintiff must identify a custom, policy, or practice by the City, and then establish that custom, policy, or practice caused the violation of his constitutional rights. "It is not enough for a §1983 plaintiff to merely identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the `moving force' behind the injury alleged. That is, plaintiff must show the action was taken with the requisite degree of culpability, and must demonstrate a

12

direct causal link between the municipal action and the deprivation of his federal rights." *Id.* at 404. "These stringent standards are necessary to avoid a *de facto respondeat superior* liability explicitly prohibited by *Monell*." *Graham, supra* at 383.

All the officers were fully trained by police academies and MCOLES certified. **Ex A**, Page 7, lines 2-6; **Ex. E**, Page 15, lines 4-10, **Ex. F**, Page 8, lines 10-15. In the Sixth Circuit, this means the Defendants were properly trained. See e.g. *Stemler v. City of Florence,* 126 F.3d 865 (6th Cir. 1997), cert. denied *Florence v. Chipman,* 523 U.S. 1118 (1998); *Bell v. Portec*, 719 F. Supp. 2d 1005, 1014 (W.D. Mich. 2010).

Moreover, the Officers received training on use of force upon hire at the Muskegon Heights Police Department. They were required to read the Use of Force Policy upon hire. **Ex. A**, Page 7, lines 6-9; **Ex E**. Page 10, lines 20-25; **Ex, F**, Page 5, lines 18-24. Further, Sgt. Sinclair provides legal updates on Use of Force through the State Police, which he shares with the officers on his team by way of e-mail. **Ex. H**, Page 9, line 221-Page 10, line 3 Additional training is made available to Officers in a classroom setting. They can attend during work time, and if they attend on their off days they get compensated for their time spent in training. **Ex. H**., Page 1-Page 11, line 7.

The United States Supreme Court most recently addressed the failure to train claims in *Connick v. Thompson*, 131 S. Ct. 1350 (2011). To establish municipal liability on a failure to train theory, Plaintiff must establish the City's failure to train its employees, in a relevant respect, rises to the level of deliberate indifference to the rights of persons with whom the untrained employees came into contact. Only then can such a shortcoming be properly thought of as a City policy or custom that is actionable under §1983. *Id.* at 1359-1360. This is a stringent standard of fault which requires proof that the City disregarded known or

obvious consequences of its actions. It is only when the City, through its policy makers, is on actual or constructive notice that a particular omission in training caused City employees to violate citizens' constitutional rights that the City can be held to be deliberately indifferent. *Id.* at 1360. It is this inaction, in light of the notice the training was the probable cause of the constitutional violation, which serves as the functional equivalent of the decision by the City itself to violate the Constitution. *Id.* (citing *Canton v. Harris*, 489 U.S. 378, 395 (1989)). In order to establish this level of deliberate indifference, Plaintiff must show a pattern of similar constitutional violations by improperly trained City employees. *Id.* at 1360 (citing *Brown, supra* at 409). In this case, there is no pattern of claims of excessive use of force which Plaintiff can point to. There is no viable claim for municipal liability for failure to rain.

As to a failure to supervise, and failure to discipline claims, Plaintiff must establish the following:

1. The existence of a clear and persistent pattern of constitutional violations by employees;
2. Notice or constructive notice on the part of the City;
3. The City's tacit approval of the unconstitutional conduct, such that its deliberate indifference in failing to act can be said to amount to an official policy of inaction; and
4. The failure to act was the "moving force" or direct causal link in the deprivation of Plaintiff's rights.

*Doe v. Claiborne County*, 113 F.3d 459, 508 (6th Cir. 1996).

Plaintiff must demonstrate a clear, persistent, and widespread pattern of constitutional violations of employees' attempts to impose liability, without establishing the separate incidents of violations of rights of which the City was aware, has been rejected by the Sixth Circuit Court of Appeals. *Thomas v. City of Chattanooga*, 398 F.3d 426, 433-34 (6th Cir.), cert. denied*,* 546 U.S. 814 (2005). The prior bad acts which establish this pattern

14

of constitutional violations must be similar to what actually occurred in this case. *Davis v City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005); *Reinhardt v. Dennis*, 399 F. Supp. 2d 803 (W.D. Mich. 2005).

During their depositions, all the Defendant officers testified they were unaware of any Citizen's Complaints filed against them for use of force, or any internal affairs investigations into them.  **Ex. A**., Page 6, lines 18-23; **Ex E**., Page 9, lines 8-14; **Ex. F**, Page 4, lines 17-22.  There have been no incidents of use of force by the Defendant Officers allegedly causing any injuries to citizens prior to this one involving Plaintiff.  There likewise is no pattern of Muskegon Heights officers using excessive force on citizens.  Plaintiff's municipal liability claim predicated on failure to discipline or failure to supervise must be dismissed.

Dated:  June 14, 2018　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　PLUNKETT COONEY


　　　　　　　　　　　　　　　　　　　　By:  /s/ Robert A. Callahan
　　　　　　　　　　　　　　　　　　　　　　　Robert A. Callahan (P47600)
　　　　　　　　　　　　　　　　　　　　　　　Attorney for Defendants
　　　　　　　　　　　　　　　　　　　　　　　950 Trade Centre Way, Suite 310
　　　　　　　　　　　　　　　　　　　　　　　Kalamazoo, MI  49002
　　　　　　　　　　　　　　　　　　　　　　　**Direct Dial:  269/226-8856**

Open.00560.81626.22294587-1